IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ARTHUR F. LESSER, IV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO.:  1:18-CV-00824-TWT |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY. | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

NOW COMES Plaintiff, Arthur Lesser, IV ("Lesser"), and, pursuant to Fed. R. Civ. P. 52(a), files this Memorandum of Law in Support of His Motion for Judgment on the Administrative Record against Defendant Reliance Standard Insurance Company ("Reliance Standard").

## I.     INTRODUCTION

This is an action for wrongful denial of long-term disability ("LTD") benefits during the Plaintiff's "own occupation" period under an employee welfare benefit plan (the "Plan") sponsored by Lesser's employer, Johnson Outdoors, Inc. ("Johnson"), insured and administered by Reliance Standard, and governed by the Employee Retirement Income Security Act of 1974, 29 USC §1001, *et. seq.* ("ERISA").  Reliance Standard incorrectly terminated LTD benefits to Lesser after

determining that he was no longer "Totally Disabled" from his "Regular Occupation" as a software engineer after October 13, 2016.  This is so even though Reliance Standard's own examining physician conceded that there was no change in Lesser's condition, or in his occupational restrictions and limitations, since he first became Totally Disabled.

As set forth below, Reliance Standard's decision on initial review and Lesser's administrative appeal was *de novo* wrong, unreasonable, and tainted by multiple procedural irregularities and self-interest.  Consequently, this Court should grant Lesser's motion for judgment under Fed. R. Civ. P. 52, award him past due benefits under the Plan, and remand this case to Reliance Standard to place Lesser back "on claim."  Additionally, this Court should award Lesser a reasonable attorney fee and costs under ERISA § 502(g) (29 U.S.C. § 1132(g).)

## II.   UNDISPUTED MATERIAL FACTS

The undisputed material facts are derived from the administrative record maintained by Reliance Standard.[1]

### A.   The Plan

At all material times, LTD benefits under the Plan were funded through a

---

[1] A copy of the administrative record, bearing bates-stamped numbers AR0001-AR1211, previously was filed with this Court under seal.  Documents within the administrative record will be referred to by the Bates Stamp Number on the bottom of the page minus the "0" prefix, *e.g.* "AR 1" instead of "AR0001".

group policy of insurance (the "Group Policy") issued by Reliance Standard to Johnson for the benefit of Johnson's eligible employees. [AR 16.]  Reliance Standard is "the claims review fiduciary" under the Group Policy and the Plan, and has "discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." [*Id.*]

The Group Policy provides that, following a 180-day Elimination Period, Reliance Standard will pay a Monthly Benefit[2] if, *inter alia,* an Insured "is Totally Disabled as the result of a Sickness or Injury[.]" [AR 20, 35.] The Group Policy defines "Totally Disabled" and "Total Disability" to mean that, "as a result of an Injury or Sickness: (1) during the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation[.]" [*Id.* at 12.]  The Group Policy examines an insured's "Regular Occupation," *i.e.* "the occupation the Insured is routinely performing when Total Disability begins," based on how "it is normally performed in the national economy, and not [on] the unique duties performed for a specific employer or in a specific locale."  [*Id.* at 11.]

Except as noted below, LTD benefits under the Group Policy cease "on the earliest of: (1) the date the Insured ceases to be Totally Disabled; (2) the date the

---

[2] The Monthly Benefit is an amount equal to 60% of Covered Monthly Earnings. [AR 9.]  Based on his annual salary of $107,937.75, Lesser's gross Monthly Benefit amount is $5,396.89. [*Id.* at 55, 56.]

Insured dies; (3) the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended; or (4) the date the Insured fails to furnish the required proof of Total Disability."  [AR 21.]  The Group Policy limits benefits to 24 months for Total Disability "caused by or contributed to by …" "Mental or Nervous Disorders" and "Self-Reported Conditions."  [*Id.* at 24, 26.]   The Group Policy defines a condition based on "Self-Reported Symptoms" as one which "cannot be verified using generally accepted standard medical procedures and practices." [*Id.* at 26.]

     C.     Lesser's Claim of Total Disability

Lesser, then 45, claimed that, effective February 15, 2016, [3] he became "Totally Disabled" from his "Regular Occupation" as a Senior Software Engineer at Johnson due to hypersomnolence (pathological sleepiness). [AR 142, 166.] Lesser, who had been clinically diagnosed with obstructive sleep apnea, explained that his disabling symptoms included excessive sleepiness, memory impairment, and difficulty in concentration. [*Id.*]

In support of Lesser's claim, his longtime treating internist, Thomas DiFulco, M.D., submitted several statements to Reliance Standard. [AR 187-90.]

---

[3] Lesser's last day of work at Johnson was February 12, 2016. [AR 102.] Because he had to estimate his last day of work before completing the disability paperwork, his date of disability was listed as February 15, 2016 instead of February 12, 2016. [*Id.*]

In a February 10, 2016 statement, Dr. DiFulco stated that the following "objective finding/symptoms and observations" precluded Lesser's ability to work: "patient has severe daytime hypersomnolence, inability to concentrate, [and] memory loss[.]" [*Id.* at 187 (emphasis supplied).]  These findings were critical, as Lesser's occupation as Software Engineer is deadline-driven, requiring a high level of cognitive function and absolute concentration. [*Id.* at 284-85.]  Consequently, Dr. DiFulco opined that, as of February 10, 2016,[4] **Lesser "should not work due to [his] inability to stay awake and [his] inability to perform [the] mental functions [of his] job requirements."**  [*Id.* at 188 (emphasis supplied).]

On June 23, 2016, Dr. DiFulco followed up his prior opinion with an Attending Physician's Statement.  [AR 174.]  Dr. DiFulco stated that Lesser suffered from cognitive dysfunction, that his symptoms "actually appeared gradually[,]" and that by February 9, 2016, his symptoms "were severe enough to warrant disability status." [*Id.*]

Dr. DiFulco then specified Lesser's restrictions and limitations with respect to performing multiple physical tasks.  [AR 175.]  These restrictions and limitations prevented Lesser from performing the material duties of his occupation

---

[4] Lesser applied for and received FMLA leave from February 15 through May 3, 2016.  [AR 170, 175-76, 182, 185, 190.]  He also received overlapping short-term disability leave through August 13, 2016.  [*Id.* at 83, 89, 162, 170, 213, 236, 417, 745.]

as Software Engineer.  [*Id.* at 284-85.]  Indeed, Dr. DiFulco determined that Lesser was "**extremely limited**" in his ability to complete and follow instructions, to perform simple and repetitive tasks, and to perform complex and varied tasks. [*Id.* at 175 (emphasis supplied).]  Dr. DiFulco opined that Lesser was "moderately limited" in his ability to relate to other people beyond giving and receiving instructions. [*Id.*]  Dr. DiFulco stated that Lesser had not reached maximum medical improvement and, as a result, that he could not determine if and when Lesser could return to work.  [*Id.*]

Gena Mastrogianakis, M.D., a board-certified family medicine physician, agreed with Dr. DiFulco's findings and conclusions regarding Lesser's inability to perform the material duties of his own occupation.  [AR 217.]  In a June 22, 2016 statement, Dr. Mastrogianakis opined that Lesser's hypersomnolence and resulting fatigue and brain fog were linked to other physical conditions with which he had been diagnosed, including adrenal insufficiency, testosterone deficiency, hypothyroidism, and intestinal dysbiosis (bacterial imbalance). [*Id.* at 217.]

**Laboratory tests and sleep studies performed by medical doctors <u>confirmed</u> these physical conditions and documented Lesser's inability to stay awake continuously throughout the day**. [AR 245, 439, 530-33, 592-93, 619-24, 639, 641, 648, 653-54.]  For instance, an MRI taken in January 2016 reflected **atrophy to the frontal and parietal lobes of Lesser's brain**.  [*Id.* at 648.]

Cardiologist Robert Hoff, M.D., noted Lesser's history of **hypothyroidism** and **obstructive sleep apnea** also played a role in his excessive sleepiness.  [*Id.* at 531-33.]

Lesser also was treated by neurologist David Bruce Rye, M.D., who also has a Ph.D in neurobiology; is board-certified in sleep medicine; and is both a Professor of Neurology at Emory University and a leading researcher in the field of hypersomnolence.  [AR 245-46, 362-63, 372-73, 380-83, 1031, 1033.]  A sleep study performed in March 2016 showed that Lesser never entered REM sleep.  [*Id.* at 439.]  In his March 24, 2016 clinical notes, Dr. Rye "suspect[ed] potentially long-term detrimental effects of untreated OSA [obstructive sleep apnea] as etiology."[5]  [*Id.* at 246.]

Dr. Rye recommended that Lesser continue to use a CPAP machine to treat

---

[5] This Court may take judicial notice that OSA is "a condition characterized by excessive day-time sleepiness … [and] is caused by the relaxation of muscles in the throat, which makes it difficult to breathe, leading a person's brain to wake them from nocturnal sleep." *McCollum v. Sec'y of HHS,* 2017 U.S. Claims LEXIS 1425, *1 n.3 (Fed. Cl. Sep. 15, 2017) (citing *Obstructive sleep apnea: Symptoms and causes*, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/obstructive-sleep-apnea/symptoms-causes/dxc-20205871 (June 26, 2017)).  *See also Reid v. Metro. Life Ins. Co*., 944 F. Supp. 2d 1279, 1323 n.27 (N.D. Ga. 2013) (district courts in ERISA cases may "take judicial notice of additional sources of medical authority in its review of technical medical terminology") (citing, *inter alia, Wangenstein v. Equifax, Inc*., 191 Fed. Appx. 905, 917 (11th Cir. 2006) (citing medical dictionary and medical journal for definitions and diagnostic features of cervical spondylosis, myelopathy, and migraines).

his OSA, which Lesser did.  [AR 362-63.]  By August 3, 2016, Dr. Rye noted that

Lesser, despite the CPAP machine, continued to suffer from "unrefreshing sleep

and hypersomnia as well as lifelong history of delayed sleep phase…."  [*Id.* at

363.]  Dr. Rye substantiated these findings via wrist actigraphy.  [*Id.* at 363, 372-

73.]  Per Dr. Rye's October 7, 2016 notes, **the wrist actigraph documented that**

**Lesser suffered from primary hypersomnia.**  [*Id.* at 373.]

> D.   Reliance Standard's Initial Review and Approval of Lesser's Claim
>       for LTD Benefits Through October 13, 2016

Reliance Standard performed a vocational assessment relative to Lesser's

claim.  [AR 286-88.]  In the national economy, the Department of Labor ("DOL")

described the demands of Lesser's occupation as follows:

> Researches, designs, and develops computer software systems, in
> conjunction with hardware product development, for medical,
> industrial, military, communications, aerospace, and scientific
> applications, applying principles and techniques of computer science,
> engineering, and mathematical analysis[.]

[AR at 286.] Among the tasks required of such occupation were: (1) the

formulation and design of "software system[s], using scientific analysis and

mathematical models to predict and measure outcome and consequences of

design"; and (2) the development of "software system testing procedures,

programming, and documentation."  [*Id.*]  As it so happens, the material duties of

Lesser's own job at Johnson <u>mirrored</u> those set forth by the DOL.  [*Id.* at 284-85.]

On September 30, 2016, Reliance Standard determined that, based on the

evidence received, "**it is reasonable to approve LTD benefits[.]**"  [AR 103, 284 (emphasis supplied).]  On or about October 17, 2016, Reliance Standard sent Lesser a lump sum check for $10,017.78, representing LTD net benefits from August 13 through October 13, 2016. [*Id.*]

> E.    Reliance Standard's Termination of Benefits Retroactive to October 14, 2016

By email dated October 17, 2016, Reliance Standard asked Lesser to identify which doctors he had seen since August 1, 2016 so that an updated medical records request could be sent. [AR 103.]  Lesser complied with its request.  [*Id.* at 104-05.] Reliance Standard then obtained complete, updated records from these providers, and sent them to a nurse for a file review.  [*Id.* at 104-07.]

The nurse determined that the Group Policy's Mental/Nervous Disorder limitation <u>did not apply</u> to Lesser's claim.  [AR 89.]  Nevertheless, on or about January 30, 2017, the nurse advised Reliance Standard that she was "unclear" as to whether Lesser's "condition prevents him working his [occupation.]" [*Id.* at 107.]

On January 30, 2017, Reliance Standard asked Lesser to send in the results of a neuropsychological evaluation that he disclosed having undergone with David Loring, Ph.D., on December 15, 2016.  [AR 107.]  The next day, Lesser emailed four of the eight-page results of Dr. Loring's neuropsychological testing that he had in his possession. [*Id.* at 108.]  Nothing in the administrative record reflects that Reliance Standard telephoned or otherwise reached out to Dr. Loring for the

other four pages of his report.

In any event, Dr. Loring noted in his report that Lesser did not suffer from any hallucinations or delusions, and that his psychomotor control was normal. [AR 646.]  Dr. Loring further stated that Lesser had "[h]igh levels of health concerns but without suggestion of somatization."  *Id.* (emphasis supplied).  Dr. Loring concluded from the cognitive testing he performed that Lesser exhibited executive function inefficiency with respect to "novel problem solving" as well as "visual constructional tasks, word retrieval inefficiency during naming, and memory retrieval inefficiency for geometric designs." [*Id.* at 645.]  As noted above, **Reliance Standard already had determined that the ability to perform these cognitive tasks is material to the occupation of a software engineer in the national economy.**  [*Id.* at 286-88.]

Nevertheless, by letter dated February 21, 2017, Reliance Standard terminated Lesser's claim for LTD benefits. [AR 125-27.]  In addition to mischaracterizing his symptoms as purely self-reported, Reliance Standard emphasized that Lesser "previously worked with the condition and elected not to try the recommended medications, which may improve your reported symptoms." [*Id.* at 126.]  Reliance Standard concluded:

> Despite your report of continued hypersomnia, your extensive testing
> to date has been unrevealing as to an etiology and you remained
> opposed to using recommended medications…. Based on the totality
> of information it remains unclear what changed at or near the date of

loss.

> While we acknowledge your reports of continued sleep apnea/anxiety, the medical [documentation] provided does not demonstrate symptoms to a severity that would continue to preclude you from working. While we understand that you may continue to experience symptoms in connection with your medical condition, and you may require ongoing treatment, when we consider the totality of the medical records on file, we find that this information does not substantiate a physical condition which presents at a level of severity that precludes you from performing the full-time material duties of a sedentary occupation.
> Given these facts, we have determined that you do not meet your group policy's definition of Total Disability and your claim must be denied.

[*Id.*]

F.   Lesser's FCE and Additional Medical Records Submitted on Administrative Appeal

By letter dated July 31, 2017 from his attorney, Lesser appealed Reliance Standard's decision to terminate benefits.  [AR 128, 742-46.] While hypersomnolence (like fibromyalgia) is often misunderstood and ignored because the etiology is not always clear, Lesser's attorney reminded Reliance Standard that the medical records it already had in its possession demonstrated several physical causes underlying his total disability.  [*Id.* at 742-46.] This notwithstanding, Lesser's attorney advised Reliance Standard that "under disability law" as well as the Group Policy, "a definite etiology is not necessary…. [W]hat is necessary, is evidence of restrictions and limitations." [*Id.* at 742-43.]

In support of his administrative appeal, Lesser submitted the results of a Functional Capacity Evaluation ("FCE") performed over the course of two days in April 2017.  [AR 747-58.]  The FCE, which "assess[ed] [Lesser's] current level of safe physical capacities in order to determine his general feasibility for employment," reflected the following:

**PHYSICAL DEMAND CHARACTERISTIC LEVEL: <u>BELOW SEDENTARY</u>**

ACTIVITY TOLERANCES AND OBSERVATIONS:

\*\*\*

<u>The client's maximum sitting tolerance at a desk setting will be no more than three total hours during a workday</u>….

\*\*\*

**Mr. Lesser will be unable to tolerate an eight-hour workday** and must remain in control of his work pace at all times, and not be forced to meet deadlines. **Working in even a sedentary job will lead to cumulative exhaustion and missed workdays that will make it difficult for him to effectively produce for an employer**…. Mr. Lesser must adhere to the recommendations made in this report in order to be an effective producer in life and avoid further complications.

[*Id.* at 747-48 (emphasis supplied).]  Along with the results of the FCE, Lesser submitted written statements from Drs. Rye and Mastrogianakis, both of whom opined that "the findings and conclusions of the FCE [were] consistent with [their respective] evaluation, treatment, observations and objective findings of Mr.

12

Lesser's condition[.]" [*Id.* at 759-60.]

G.    Reliance Standard's IME

Reliance Standard scheduled Lesser to undergo an independent medical examination ("IME") by neurologist David Whitcomb, M.D. on October 26, 2017. [AR 1181-82, 1198.]  Contrasted to Dr. Rye's background and board-certification in sleep medicine, nothing in the administrative record reflects that Dr. Whitcomb has any expertise or background in sleep disorders.  Not only that, but unlike Dr. Rye who treated Lesser over several months, Dr. Whitcomb expressly clarified that his IME did <u>not</u> "constitute a general medical examination[.]" [*Id.* at 1201.]

Dr. Whitcomb, nevertheless, concurred with Lesser's treating physicians in concluding that, <u>as of October 13, 2016</u>, Lesser did suffer from **"a sleep disorder in part caused by obstructive sleep apnea[,]"** and the medical records he reviewed **"substantiate [Lesser's] claims"** of fatigue, "<u>chronic</u> sleepiness," and hypothyroidism.  [*Id.* at 1204 (emphasis supplied).]  Dr. Whitcomb, in fact, opined that **Lesser's "impairments were <u>well-established by October 13, 2016</u>, and he had <u>shown no real improvement since</u> his symptoms became severe in February of 2016.**" [*Id.* at 1205 (emphasis supplied).]

In terms of Lesser's prognosis, Dr. Whitcomb even noted that "**[i]t may be that <u>his former occupation of being a software engineer would be impossible to him</u> ….**"  [AR at 1205 (emphasis supplied).]  Indeed, Dr. Whitcomb, in a

separate Physical Capabilities Questionnaire completed on October 26, 2017,

stated that Lesser could not sit, stand, walk, bend at the waist, squat, climb stairs,

use foot controls, or drive continuously in an 8-hour day.  [*Id.* at 1199.]  Nor could

Lesser, according to Dr. Whitcomb, use either hand to perform simple grasping,

reaching, pushing, pulling, fine manipulation, or keyboarding on a continuous

basis.  [*Id.* at 1200.]  As noted above, continuously performing these tasks was a

material responsibility of a software engineer.  [*Id.* at 284-88.]

Incredulously, though, Dr. Whitcomb concluded that Lesser could return to

work in his own occupation from a "physical standpoint."  [AR 1206.]  Dr.

Whitcomb did not reconcile this conclusion with his findings from the IME and

review of Lesser's medical records.  [*See id.*]  Instead, Dr. Whitcomb stated:

> My own recommendations, if I were involved in his case, were to
> obtain a further psychiatric or neuropsychiatric evaluation ….
> As far as I can tell from his history in the records, other kinds of
> treatment in addition to antidepressants and antianxiety medications
> have been recommended, some of which he has not been able to
> tolerate, such as mild stimulants like Provigil and Nuvigil, but
> other treatments, as stimulants, he has evidently not been willing to
> try such as Strattera, Adderall, and Ritalin. A psychiatrist might
> pursue these other options assuming that his physical condition is
> stable and from the records I have his condition would tolerate other
> such treatments.

[AR 1204.]  Dr. Whitcomb apparently overlooked that Lesser had been prescribed

stimulants like Provigil and Nuvigil by Dr. DiFulco to stay awake during the day,

*i.e.,* to treat his hypersomnolence, <u>not</u> any mental or nervous condition.  [*Id.* at 60,

434.]

### H.   Reliance Standard's Vocational Review by the Same Analysis

Following the IME, Reliance Standard referred Lesser's file for a vocational

assessment by the same analyst who performed a vocational assessment during the

initial claim review.  [AR 1209-10.]  Without explanation or attempt to reconcile

Lesser's documented inability to stay awake throughout the day or perform the

material duties of his own occupation, the analyst determined that "in

consideration of how this occupation is typically performed, … Lesser would be

able to perform his regular occupation within the restrictions and limitations

noted."  [*Id.* at 1210.]

### I.   Reliance Standard's Adverse Decision on Lesser's Appeal

By letter dated November 20, 2017, Reliance Standard upheld its decision to

terminate benefits to Lesser.  [AR 132-37.]  Reliance Standard advised his attorney

that "Lesser's condition was not of such a severity to render him unable to perform

the material duties of his Regular Occupation on a full-time basis beyond October

13, 2016. As such, he no longer satisfied the definition of Total Disability beyond

October 13, 2016, as defined under [the Group Policy] … and no further benefits

are payable."  [*Id.* at 136.]

## III. ARGUMENT AND CITATIONS OF AUTHORITY

In analyzing ERISA benefits claims under Federal Rule of Civil Procedure

52,[6] district courts in the Eleventh Circuit apply a six-step framework, as follows:

(1)     Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir. 2011) (*per curiam*). The Court is limited to the administrative record in making the above determinations. *Id.*; *Jett v. Blue Cross & Blue Shield, Inc*., 890 F.2d 1137, 1139

---

[6] Rule 52(a)(1), which provides the appropriate mechanism for adjudicating ERISA benefit claims, *Tippitt v. Reliance Standard Life Ins. Co.*, 276 Fed. Appx. 912, 914-15 (11th Cir. 2008), states, in relevant part: "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately...."

(11th Cir. 1989).

    A.    <u>Reliance Standard's Decision to Terminate Benefits Was *De Novo*</u>
<u>Wrong.</u>

As noted above, ERISA's framework requires this Court to decide first if

Reliance Standard's termination of Lesser's LTD benefits was *de novo* wrong.

*Accord Blankenship,* 644 F.3d at 1355. A decision made by an administrator is

"wrong" if, after a *de novo* review of the administrative record, the Court does not

agree with the decision. *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241,

1246 (11th Cir. 2008). As discussed below, the administrative record, on its face,

shows that Reliance Standard's decision to terminate benefits was *de novo wrong*.

    1.    <u>Lesser Met His Burden of Demonstrating He was Totally Disabled.</u>

At all relevant times, Lesser showed that he was "Totally Disabled" from his

"Regular Occupation" as a Senior Software Engineer at Johnson. [AR 11-12, 102-

03, 166, 187-90, 217, 284-88, 648.] As Reliance Standard's own vocational

assessment showed, the occupation of software engineer, even in the national

economy, is no ordinary "desk job." [AR 286-88.] Rather, the occupation (as did

Lesser's job at Johnson) requires a significant level of cognitive ability to engage

in complex and multi-level problem solving and to design highly technical

computer software programs. [*Id.* at 284-88.]

For LTD benefits to be payable, the Group Policy required Lesser to show

that he could not perform "<u>the</u> material duties" of his Regular Occupation. [AR 12

(emphasis supplied).]  The federal common law of ERISA in this Circuit interprets the phrase "the material duties" to mean that a participant's inability to perform even one material duty of his/her regular occupation entitles him/her to total disability benefits under the Plan.  *See Granger v. Life Ins. Co. of N. Am.,* 2016 U.S. Dist. LEXIS 182279, at *29-30 (M.D. Fla. Mar. 28, 2016) (construing ERISA plan's definition of "Total Disability" as claimant's inability because of Injury or Sickness "to perform all the material duties of his/her regular occupation" to mean that a claimant's inability to perform even one such duty precludes a finding that he/she is not disabled) (citing *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 345 (5th Cir. 2002) (policy defining disability as inability to "perform each of the material duties of" occupation requires claimant to show he/she is "unable to perform only a single material duty of" such occupation), *abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-19 (2008), and *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1133-34 (9th Cir. 1996) (person is disabled under ERISA plan requiring that person to perform "every duty" of the relevant occupation if he/she "is unable to perform one of the essential duties of his or her position")).  *Cf. Tippitt v. Reliance Standard Life Ins. Co*., 457 F. 3d 1227, 1235 (11th Cir. 2006) (ambiguity in ERISA plan must be construed "against the drafter, and the claimant's interpretation is considered correct.").

In paying him LTD benefits from August 13 through October 13, 2016,

Reliance Standard necessarily determined that Lesser, due to sickness, was unable to perform one or more of the material duties of a software engineer on a full-time basis as of February 15, 2016.  [AR 11-12, 102-03.]  That is, Reliance Standard necessarily determined that Lesser satisfied his obligations under the terms of the Group Policy through October 13, 2016.

    2.  <u>The Administrative Record Belies Any Basis Supporting Reliance Standard's February 21, 2017 Termination of Lesser's Benefits Retroactive to October 14, 2016</u>.

Given that it had found Lesser "Totally Disabled" under the Plan as of October 13, 2016, for Reliance to terminate benefits effective the following day, Lesser's condition and occupational restrictions and limitations would have had to significantly change. *Accord Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1331 (11th Cir. 2001) (so supporting).  The administrative record belies that they did.

Indeed, objective tests confirmed that, even in December 2016, Lesser continued to exhibit executive function inefficiency with respect to "novel problem solving" as well as "visual constructional tasks, word retrieval inefficiency during naming, and memory retrieval inefficiency for geometric designs." [AR 939.]  As noted above, **Reliance Standard already had determined that the ability to perform these cognitive tasks is material to the occupation of a software engineer in the national economy.**  [*Id.* at 286-88, (emphasis supplied).]

Of greater import, Dr. Whitcomb, the neurologist employed by Reliance

Standard to perform the IME, opined that, <u>as of October 13, 2016,</u> Lesser's

**"impairments were well-established."**  [AR 1205 (emphasis supplied).] In fact,

Dr. Whitcomb determined that Lesser "**had shown no real improvement since …**

**February of 2016.**" [*Id.* (emphasis supplied).]

Despite this, Reliance Standard, in terminating benefits, concluded that

Lesser's conditions were not "at a level of severity that precludes [Lesser] from

performing the full-time material duties of a <u>sedentary</u> occupation." [AR 126

(emphasis supplied).]  But, as noted above, Reliance Standard's own vocational

assessment showed that Lesser's occupation in the national economy required

significant cognitive tasks. [*Id.* at 286-88.]   As such, Reliance Standard's

classification of that work as purely "sedentary" was *de novo* wrong.  *See Pharr v.*

*Continental Cas. Co.*, Case No. 6:03-cv-00735-ACC (M.D. Fla. May 12, 2004)

("[I]t is ludicrous to suggest that Pharr had the ability to carry out her occupational

responsibilities while experiencing the symptoms and attendant functional

limitations caused by her CFS.");[7] *Dorsey v. Provident Life & Acc. Ins. Co*., 167 F.

Supp. 2d 846, 855-56 (E.D. Pa. 2001) (granting summary judgment to ERISA

plaintiff under plan's "own occupation" definition of total disability where

insurer's vocational consultant never addressed the fact that plaintiff's job required

---

[7] A copy of *Pharr* is attached to this memorandum as Exhibit 1.

traveling); *Small v. First Reliance Standard Life Ins. Co*., 2005 U.S. Dist. LEXIS 3153, *18-19 (E.D. Pa. Feb. 28, 2005) ("First Reliance failed to assess how Small's ability to function at a sedentary level would enable her to perform the cognitive-based material duties of her job.").

Reliance Standard arbitrarily ignored the results of Lesser's April 2017 FCE which showed that his physical capabilities were "below sedentary."  [AR 747-58.] In ERISA cases, FCEs are the "best means of assessing an individual's functional level" and objectively quantifying his/her work-related restrictions and limitations. *Lake v. Hartford Life & Acc. Ins. Co*., 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004).  *Accord Fick v. Metro. Life Ins. Co.,* 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004); *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F. 3d 538, 548 (6th Cir. 2015).  Likewise, Reliance Standard arbitrarily failed to credit the opinions of Dr. Rye and Dr. Mastroiganakis that "the findings and conclusions of the FCE [were] consistent with [their respective] evaluation treatment, observations and objective findings of Mr. Lesser's condition[.]" [AR 759-60.]  While an ERISA fiduciary is not required to give special weight to the opinions of a claimant's treating physicians, it may not arbitrarily refuse to credit (let alone ignore) reliable evidence, including the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *accord Claridge v. Cont'l Cas. Co.,* 2006 U.S. Dist. LEXIS 77382, *33-34 (N.D. Fla. Oct. 24, 2006) (deeming

administrator's benefits decision *de novo* wrong where it disregarded treating physician's opinion without explanation) (citation omitted).

But even more incredible, Reliance Standard's own expert, Dr. Whitcomb, found that, in an 8-hour day, Lesser could not sit, stand, walk, bend at the waist, squat, climb stairs, use foot controls, or drive continuously, nor use either hand to perform simple grasping, reaching, pushing, pulling, fine manipulation, or keyboarding on a continuous basis.  [*Id.* at 1199-1200.]  The fact that the administrative record shows continuously performing one or more of these tasks over an 8-hour day is a material responsibility of Lesser's "Regular Occupation" perhaps explains why Dr. Whitcomb opined that "being a software engineer" may "be <u>impossible</u> to" Lesser.  [*Id.* at 284-88, 1205 (emphasis supplied).]

In short, Lesser's documented inability to perform even one material duty of the regular occupation of a software engineer at all relevant times precluded Reliance Standard's finding that he was not disabled under the Plan.  Its decision to terminate benefits, therefore, was *de novo* wrong.

B. <u>Reliance Standard's Decision to Terminate Benefits Was Unreasonable.</u>

Because the Group Policy bestowed the requisite discretionary authority on Reliance Standard, this Court, under *Blankenship, supra,* must analyze whether Reliance Standard's decision to terminate benefits to Lesser was reasonable.  The administrative record shows it was not.

Specifically, in its termination letter dated February 21, 2017, Reliance Standard mischaracterized Lesser's hypersomnia as purely "self-reported". [AR 126.]  Notwithstanding that a "self-reported" condition (by itself) would not have entitled Reliance Standard under the Group Policy to terminate benefits prior to 24 months of payment, the administrative record belies that Lesser's total disability could not "be verified using generally accepted standard medical procedures and practices." [*Id.* at 26.]  Indeed, a sleep study, bloodwork, wrist actigraphy, CPAP data (*Id.* at 682-695), a Functional Capacity Evaluation (*Id.* at 747-758), a Psychomotor Vigilance Test (*Id.* at 245), and neuropsychological testing: (1) document that Lesser suffers from primary hypersomnia; (2) provide objective bases for Lesser's extreme fatigue and chronic sleepiness; and (3) belie that Lesser's disabling symptoms were "self-reported."  *See also, generally, Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 322 (7th Cir. 2007) (distinguishing "between the amount of fatigue or pain an individual experiences, which … is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured[.]").

None of this matters, however, because terminating benefits because a disabling condition lacks a clear etiology is an abuse of discretion where, as here: (1) the Plan does not require a definitive etiology; and (2) the condition is verifiable by objective medical tests.  *Accord Brucks v. Coca-Cola Co.,* 391 F.

Supp. 2d 1193, 1206 (N.D. Ga. 2005) (even if a diagnosis does not lend itself to objective clinical findings, the physical limitations imposed by the symptoms of such condition may lend themselves to objective analysis); *Florence Nightingale Nursing Serv. v. Blue Cross/Blue Shield*, 41 F.3d 1476, 1484 (11th Cir.1995) (ERISA fiduciary abuses its discretion when, like Reliance Standard did here, it uses standards not required in the Plan when making claim determinations). *See also Godfrey v. BellSouth Telecomm., Inc*., 89 F.3d 755, 759-60 (11th Cir. 1996) (idiopathic diagnoses like fibromyalgia "can be severely disabling and can only be diagnosed by an examination of the patient"); *Pharr v. Continental Cas. Co*., *supra* (granting summary judgment to ERISA plaintiff who claimed total disability due to idiopathic conditions of fibromyalgia and chronic fatigue); *Russell v. UNUM Life Ins. Co. of Am*., 40 F. Supp. 2d 747, 750-51 (D.S.C. 1999) (fibromyalgia did not fall under ERISA plan's "self-reported symptom" limitation where, like Lesser's hypersomnia, it could be and, in fact, was verified by objective medical evidence); *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 422-43 (3d. Cir. 1997) (ERISA fiduciary impermissibly implied additional "clinical evidence of etiology" requirement not specified in disability plan).

Reliance Standard noted in terminating his benefits that Lesser had worked despite having hypersomnolence for some time before filing for LTD benefits. But such fact does not render its termination of benefits reasonable. First, Reliance

Standard inexplicably refused to address the gradual and continuing nature of his disability, which Dr. DiFulco explained.  [*See, e.g.,* AR 174.]  Second, as a matter of ERISA federal common law, a participant's struggle to continue working while his health is deteriorating (as Lesser did here) does not count against his disability claim; rather, it is a credit. *See Marecek v. Bellsouth Telecommunications, Inc*., 49 F.3d 702, 706 (11th Cir. 1995) (disabled participant's attempt to return to work for two days did not show she, in fact, was no longer totally disabled); *Godfrey*, 89 F.3d at 759 ("[W]ith a dependent son, the plaintiff had no real choice other than to dope herself up with the medications that had been prescribed for her and get in the car, contrary to medical advice, drive herself to work, and then work while under the influence of a combination of very potent drugs."); *Levinson*, 245 F.3d at 1326 n.6 ("We doubt that Levinson's status as a full-time employee constitutes evidence that he was able to perform the material duties of his occupation on a full-time basis."); *Lasser v. Reliance Standard Life Ins. Co*., 344 F.3d 381, 392 (3d Cir. 2003) ("A claimant's return to work is not dispositive of his or her disability when economic necessity compels him or her to return to work.").

In short, the administrative record, when viewed in its entirety, shows Reliance Standard acted arbitrarily and capriciously in terminating Lesser's claim for benefits. Reliance Standard disregarded objective medical evidence produced by Lesser's treating physicians and, instead, chose to rely selectively on parts of

Dr. Whitcomb's opinion while ignoring other parts which did not support its position.  Because terminating benefits here was *de novo* wrong and unreasonable, this Court, under *Blankenship,* should enter judgment on the administrative record in favor of Lesser.

    C.    <u>The Administrative Record Shows Reliance Standard Suffered an Actual Conflict of Interest in Terminating Benefits.</u>

Reliance Standard had a structural conflict of interest insofar as it decided claims for benefits and funded them.  *Accord, generally, Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Thus, to the extent that this Court finds that reasonable grounds for Reliance Standard's claim termination exist, it must proceed to the sixth step of the *Blankenship* analysis.

Multiple procedural and substantive defects in the administrative record show that Reliance Standard suffered an <u>actual</u> conflict of interest when it terminated Lesser's claim.  For example, Reliance Standard relied only on a nurse's review prior to initially terminating Lesser's benefits.  This is so despite the multitude of medical specialists who treated Lesser.  Terminating benefits based solely upon a nurse's review of records, without so much as a peer review or an IME, showed conflict.  *See Helms v. Gen. Dynamics Corp*., 222 F. App'x 821, 829 (11th Cir. 2007) ("Aetna's reliance on a registered nurse's review of an admittedly subjective diagnosis without so much as a peer review or an IME was wrong and unreasonable.") (citing *Godfrey*, 89 F.3d at 758-759 (where record

supported that defendant's physicians arbitrarily rejected clear medical evidence that plaintiff without examining plaintiff themselves or seeking treatment notes of her doctors); *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 n.11 (11th Cir. 1990) (improper motive sufficient to set aside fiduciary's decision may be inferred from failure to investigate); *Calvert v. Fir star Fin., Inc.,* 409 F.3d 286, 296 (6th Cir. 2005) ("[W]here the administrator forgoes a physical examination, questions may be raised concerning the accuracy of the benefits decisions.").

Also evidencing conflict was Reliance Standard's "cherry-picking" parts of Dr. Whitcomb's comments out of context, while ignoring his inherently contradictory opinion that Lesser's condition had not changed, and that he could not continuously perform tasks essential to his occupation. "This inconsistent treatment of the same authority in two separate instances … raises the likelihood of self-dealing." *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 394 (3d Cir. 2000). Deference should be "ratcheted" downward by such "suspicious events." *Id. Accord Hagberg v. Liberty Life Assurance Co.,* 321 F. Supp. 2d 1270, 1273 (N.D. Fla. 2004) (administrator showed actual conflict of interest where IME physician, as Dr. Whitcomb did here, agreed with claimant's diagnosis given by treating physicians and provided no reasoned explanation why, contrary to the other medical opinions, he believed claimant could work a sedentary job 40 hours

a week); *Ferguson v. Hartford Life & Accident Ins. Co.*, 268 F. Supp. 2d 463, 471

(E.D. Pa. 2003) (claim administrator's selectivity in evidence and disregard of

sleep studies and other records supporting participant's claim of disabling sleep

disorder "invites a closer scrutiny of the decision making process").

   Especially troubling is Dr. Whitcomb's gratuitous suggestion that Lesser's

symptoms were the result of a Mental or Nervous Disorder.  Notwithstanding the

physical etiology of his condition, *supra,* and that Reliance Standard already had

determined that the Group Policy's Mental/Nervous limitation did not apply to

Lesser's claim [AR 89], Dr. Whitcomb did not specialize in any form of

psychiatry. That Dr. Whitcomb confused stimulants that Lesser had been

prescribed for his hypersomnia as treatment of a mental or nervous condition

bolsters this conclusion.  [*Id.* at 60, 434, 1204]  Even more glaring, Dr.

Whitcomb's comment ignores that Dr. Loring found no evidence of somatization.

[*Id.* at 646.]  Simply put, nothing in the administrative record suggests that a

mental disorder caused Lesser's hypersomnia.  *See, e.g., Nevitt v. Standard Ins.

Co.,* 2009 U.S. Dist. LEXIS 114142, at *15 (N.D. Ga. Dec. 3, 2009) (rejecting

administrator's determination that mental disorder contributed to participant's

migraines, where his treating physicians each noted that his migraines were likely

related to his cervical injuries and were "not surprising" given his condition).

## IV.   CONCLUSION

Based on the foregoing, Lesser is entitled to judgment reinstating his claim, awarding him all LTD benefits wrongfully withheld from October 14, 2016 through the date of judgment, an award of prejudgment interest, and attorney fees under 29 U.S.C. § 1132(g).  (Due to space limitations, Lesser cannot brief the basis for his entitlement to attorney fees; he will, however, should the Court allow him leave to do so.)

Respectfully submitted, this 15th day of November, 2018.

/s/*Paul J. Sharman*
Paul J. Sharman
Georgia Bar No. 227207
The Sharman Law Firm LLC
11175 Cicero Dr., Suite 100
Alpharetta, Georgia 30022
(678) 242-5297
paul@sharman-law.com

Counsel for Plaintiff