IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ARTHUR F. LESSER, IV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO.: 1:18-CV-00824-TWT |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Arthur Lesser, IV ("Lesser"), and files this

Memorandum of Law in Opposition to the Motion for Summary Judgment filed by

Defendant Reliance Standard Insurance Company ("Reliance Standard").

## I.    INTRODUCTION

Inherently conflicted ERISA[1] claims administrator, Reliance Standard,

wrongfully terminated Lesser's long-term disability ("LTD") benefits effective

October 14, 2016, after determining that he was no longer "Totally Disabled" from

his "Regular Occupation" as a software engineer.  This is so even though: (1)

Reliance Standard's "independent" physician determined before benefits were

terminated that there was no change in Lesser's condition, or in his occupational

---

[1] The Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et.
seq*.

restrictions and limitations, since he first became Totally Disabled; (2) the results of a Functional Capabilities Evaluation ("FCE"), the "gold star" in determining the scope of disability in ERISA cases, showed that, as of April 2017, Lesser's physical demand level was "below sedentary;" (3) objective tests, including MRI, wrist actigraphy, bloodwork, PVT, data from Lesser's CPAP machine, and a sleep study, showed that Lesser suffered from excessive sleep and a cognitive impairment sufficiently severe to preclude him from performing the material duties of his occupation when viewed in the national economy; and (4) Reliance Standard determined that the "Mental/Nervous Disorder" limitation in the Plan did not apply to Lesser's claim. Because Reliance Standard's claim decision was *de novo* wrong, unreasonable, and tainted by multiple procedural irregularities and self-interest, this Court should deny Reliance Standard's motion, and award Lesser reasonable attorney fees and costs under ERISA § 502(g) (29 U.S.C. § 1132(g).)

## II.     RESPONSE TO DEFENDANT'S STATEMENT OF FACTS[2]

### A.     The Plan

At all material times, Johnson Outdoors, Inc. ("Johnson") has sponsored an employee welfare benefit plan (the "Plan") for the benefit of its eligible employees,

---

[2] Plaintiff Lesser's response to Reliance Standard's statement of facts is derived from the 1211-page administrative record ("AR") maintained by Reliance Standard.

including Lesser. [AR 16.]  Reliance Standard funds LTD benefits and, at the same time, serves as "the claims review fiduciary" under the Plan. [*Id.*]

Under the Plan, Reliance Standard pays LTD benefits if, *inter alia,* an Insured "is Totally Disabled as the result of a Sickness or Injury[.]" [AR 20, 35.] The Plan defines "Totally Disabled" and "Total Disability" to mean that, "as a result of an Injury or Sickness: (1) during the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation[.]" [*Id.* 12.]  "Regular Occupation" is based on how "it is normally performed in the national economy[.]" [*Id.* 11.]

The Plan limits benefits to 24 months for Total Disability "caused by or contributed to by  "Mental or Nervous Disorders" and "Self-Reported Conditions." [AR 24, 26.]   The Group Policy defines a condition based on "Self-Reported Symptoms" as one which "cannot be verified using generally accepted standard medical procedures and practices." [*Id.* 26.]

B.    Lesser's Claim of Total Disability

Lesser, then 45, claimed that, effective February 15, 2016, he became "Totally Disabled" from his "Regular Occupation" as a Senior Software Engineer at Johnson due to hypersomnolence (pathological sleepiness). [AR 142, 166.] Lesser, who had been clinically diagnosed with obstructive sleep apnea, explained that his disabling symptoms included excessive sleepiness, memory impairment,

and difficulty in concentration. [*Id.*]

In support of Lesser's claim, his longtime treating internist, Thomas DiFulco, M.D., submitted several statements to Reliance Standard. [AR 187-90.] In a February 10, 2016 statement, Dr. DiFulco stated that the following "<u>objective</u> finding/symptoms and observations" precluded Lesser's ability to work: "patient has <u>severe</u> daytime hypersomnolence, inability to concentrate, [and] memory loss[.]" [*Id.* 187 (emphasis supplied).] These findings were critical, as Lesser's occupation as Software Engineer is deadline-driven, requiring a high level of cognitive function and absolute concentration. [*Id.* 284-85.] Consequently, Dr. DiFulco opined that, as of February 2016, Lesser "should not work due to [his] inability to stay awake and [his] inability to perform [the] mental [*i.e.,* <u>cognitive</u>] <u>functions</u> [of his] job requirements." [*Id.* 188.]

On June 23, 2016, Dr. DiFulco followed up his prior opinion with an Attending Physician's Statement. [AR 174.] Dr. DiFulco stated that Lesser suffered from cognitive dysfunction, that his symptoms "actually appeared gradually[,]" and that by February 9, 2016, his symptoms "were severe enough to warrant disability status." [*Id.*]

Dr. DiFulco then specified Lesser's restrictions and limitations which prevented Lesser from performing the material duties of his occupation as a software engineer. [AR 175; *see also id.* at 284-85.] Indeed, Dr. DiFulco

determined that Lesser was "**extremely limited**" in his ability to complete and follow instructions, to perform simple and repetitive tasks, and to perform complex and varied tasks. [*Id.* 175 (emphasis supplied).] Dr. DiFulco opined that Lesser was "moderately limited" in his ability to relate to other people beyond giving and receiving instructions. [*Id.*]

Gena Mastrogianakis, M.D., a board-certified family medicine physician, agreed with Dr. DiFulco's findings and conclusions regarding Lesser's inability to perform the material duties of his own occupation. [AR 217.] In a June 22, 2016 statement, Dr. Mastrogianakis opined that Lesser's hypersomnolence and resulting fatigue and brain fog were linked to other physical conditions with which he had been diagnosed, including adrenal insufficiency, testosterone deficiency, hypothyroidism, and intestinal dysbiosis (bacterial imbalance). [*Id.* 217, 362.]

**Blood tests, a sleep study, wrist actigraphy, CPAP data, and other tests <u>confirmed</u> Lesser's physical conditions and documented his inability to stay awake continuously throughout the day**. [AR 154, 439, 488, 530-33, 648, 938-45.] For instance, an MRI taken in January 2016 reflected **atrophy to the frontal and parietal lobes of Lesser's brain**. [AR 648, 938-45.] Cardiologist Robert Hoff, M.D., noted that Lesser's history of **hypothyroidism** and **obstructive sleep apnea** also played a role in his hypersomnia. [*Id.* 531-33.]

Lesser also was treated by neurologist David Bruce Rye, M.D., who also has a Ph.D in neurobiology; is board-certified in sleep medicine; and is both a Professor of Neurology at Emory University and a leading researcher in the field of hypersomnolence. [AR 245-46, 362-63, 372-73, 1031, 1033.] A sleep study performed in March 2016 showed that Lesser never entered REM sleep. [*Id.* 439.] In his March 24, 2016 clinical notes, Dr. Rye "suspect[ed] potentially long-term detrimental effects of untreated OSA [obstructive sleep apnea] as etiology."[3] [*Id.* 246.] Dr. Rye recommended that Lesser continue to use his CPAP machine to treat his OSA, which Lesser did. [AR 362-63.] But, by August 3, 2016, Dr. Rye noted that Lesser, despite the CPAP machine, continued to suffer from "unrefreshing sleep and hypersomnia as well as lifelong history of delayed sleep phase…." [*Id.* 363.] Dr. Rye substantiated these findings via wrist actigraphy. [*Id.* 363, 372-73.] Per Dr. Rye's October 7, 2016 notes, **the wrist actigraphy documented that Lesser suffered from primary hypersomnia.** [*Id.* 373.]

The threshold for a diagnosis of Primary Hypersomnia is sleep near or over 11 hours. [*Id.* 363, 373.] Lesser met that threshold. [*Id.* at 373, 682-95, 763-80.]

---

[3] OSA, is "a condition characterized by excessive day-time sleepiness" and "is caused by the relaxation of muscles in the throat, which makes it difficult to breathe, leading a person's brain to wake them from nocturnal sleep." *McCollum v. Sec'y of HHS,* 2017 U.S. Claims LEXIS 1425, *1 n.3 (Fed. Cl. Sep. 15, 2017)) (citing *Obstructive sleep apnea: Symptoms and causes*, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/obstructive-sleep-apnea/symptoms-causes/dxc-20205871 (June 26, 2017)).

C.    Reliance Standard's Approval of Lesser's Claim

Reliance Standard performed a vocational assessment relative to Lesser's claim. [AR 286-88.] In the national economy, the Department of Labor ("DOL") described the demands of Lesser's occupation as follows:

> Researches, designs, and develops computer software systems, in conjunction with hardware product development, for medical, industrial, military, communications, aerospace, and scientific applications, applying principles and techniques of computer science, engineering, and mathematical analysis[.]

[AR at 286.] Among the tasks required of such occupation were: (1) the formulation and design of "software system[s], using scientific analysis and mathematical models to predict and measure outcome and consequences of design"; and (2) the development of "software system testing procedures, programming, and documentation." [*Id.*] As it so happens, the material duties of Lesser's own job at Johnson mirrored those set forth by the DOL. [*Id.* 284-85.]

On September 30, 2016, Reliance Standard determined that, based on the evidence received, "it is reasonable to approve LTD benefits[.]" [AR 103, 284.] On or about October 17, 2016, Reliance Standard sent Lesser a lump sum check for payment of LTD benefits through October 13, 2016. [*Id.*]

D.     <u>Reliance Standard's Termination of Benefits Retroactive to October 14, 2016</u>

A nurse who reviewed Lesser's medical records at Reliance Standard's request subsequent determined that the Plan's Mental/Nervous Disorder limitation <u>did not apply</u> to Lesser's claim. [AR 89.] This is not surprising, as a neuropsychological evaluation performed by David Loring, Ph.D., on December 15, 2016 showed that Lesser did not suffer from any hallucinations or delusions, and that his psychomotor control was normal. [*Id.* 940]

In his report, Dr. Loring further stated that Lesser had "[h]igh levels of health concerns but without suggestion of somatization." [AR 940] Dr. Loring concluded that Lesser exhibited executive function inefficiency (*i.e.,* cognitive dysfunction) with respect to "novel problem solving" as well as "visual constructional tasks, word retrieval inefficiency during naming, and memory retrieval inefficiency for geometric designs." [*Id.* 938.] As noted above, **Reliance Standard already had determined that the ability to perform these cognitive tasks is material to the occupation of a software engineer in the national economy.** [*Id.* 286-88.]

Nevertheless, by letter dated February 21, 2017, Reliance Standard terminated Lesser's claim for LTD benefits. [AR 125-27.] In addition to mischaracterizing his symptoms as purely self-reported, Reliance Standard

emphasized that Lesser "previously worked with the condition and elected not to try the recommended medications, which may improve your reported symptoms." [*Id.* 126.] Reliance Standard concluded:

> Despite your report of continued hypersomnia, your extensive testing to date has been unrevealing as to an etiology and you remained opposed to using recommended medications…. Based on the totality of information it remains unclear what changed at or near the date of loss.

> While we acknowledge your reports of continued sleep apnea/anxiety, the medical [documents] provided … does not substantiate a physical condition which presents at a level of severity that precludes you from performing the full-time material duties of a sedentary occupation.

[*Id.*] Notably, Reliance Standard did not explain why it had found Lesser to be totally disabled as of October 13, but not the following day.

E.      Lesser's FCE and Additional Medical Records Submitted on Administrative Appeal

Lesser timely appealed Reliance Standard's decision to terminate benefits. [AR 128, 742-46.] Lesser's attorney explained that even though the etiology of hypersomnolence is not always clear, "a definite etiology is not necessary" for payment of benefits; rather, "what is necessary, is evidence of restrictions and limitations." [*Id.* 742-43.]

In support of his appeal, Lesser submitted the results of an FCE performed in April 2017. [AR 747-58.] The FCE, which "assess[ed] [Lesser's] current level of safe physical capacities in order to determine his

general feasibility for employment": (1) reflected that Lesser's physical demand level was **"<u>BELOW SEDENTARY</u>"**; (2) showed that Lesser's "<u>maximum sitting tolerance at a desk setting will be no more than three total hours during a workday</u>"; (3) supported that "**Lesser will be unable to tolerate an eight-hour workday** and [that he] must remain in control of his work pace at all times, and not be forced to meet deadlines"; and (4) substantiated that Lesser's **"[w]orking in even a sedentary job will lead to cumulative exhaustion and missed workdays that will make it difficult for him to effectively produce for an employer**…." [*Id.* 747-48 (emphasis supplied).][4] Lesser submitted statements from Drs. Rye and Mastrogianakis opining that "the findings and conclusions of the FCE [were] consistent with [their respective] evaluation treatment, observations and objective findings of Mr. Lesser's condition[.]" [*Id.* 759-60.]

     F.    <u>Reliance Standard's IME</u>

     Reliance Standard scheduled Lesser to undergo an independent medical examination ("IME") by neurologist David Whitcomb, M.D. on October 26, 2017. [AR 1181-82, 1198.]  Contrasted with Dr. Rye's background and board-certification in sleep medicine, nothing in the administrative record reflects that Dr.

---

[4] The FCE even showed objective evidence of heart rate spikes when sitting upright and keyboarding.  [*See* AR 747-58.]

Whitcomb has any expertise or background in sleep disorders.  Not only that, but unlike Dr. Rye who treated Lesser over several months, Dr. Whitcomb expressly clarified that his IME did <u>not</u> "constitute a general medical examination[.]" [*Id.* 1201.]

Dr. Whitcomb, nevertheless, concurred with Lesser's treating physicians in concluding that, <u>as of October 13, 2016</u>, Lesser did suffer from **"a sleep disorder in part caused by obstructive sleep apnea[,]"** [emphasis added] and the medical records he reviewed **"substantiate [Lesser's] claims"** of fatigue, "<u>chronic sleepiness</u>," and hypothyroidism.  [*Id.* 102, 1204 (emphasis supplied).]  Dr. Whitcomb, in fact, opined that **Lesser's "impairments were <u>well-established by October 13, 2016</u>, and he had <u>shown no real improvement since</u> his symptoms became severe in <u>February of 2016</u>.**" [*Id.* 1205 (emphasis supplied).]

In terms of Lesser's prognosis, Dr. Whitcomb even noted that "**[i]t may be that <u>his former occupation of being a software engineer would be *impossible* to him ….</u>**" [AR at 1205 (emphasis supplied).]  Indeed, Dr. Whitcomb, in a separate Physical Capabilities Questionnaire completed on October 26, 2017, stated that Lesser could not sit, stand, walk, bend at the waist, squat, climb stairs, use foot controls, or drive continuously in an 8-hour day.  [*Id.* 1199.]  Nor could Lesser, according to Dr. Whitcomb, use either hand to perform simple grasping, reaching, pushing, pulling, fine manipulation, or keyboarding on a continuous basis.  [*Id.*

1200.]  As noted above, continuously performing these tasks was a material responsibility of a software engineer.  [*Id.* 284-88.]

Incredulously, though, Dr. Whitcomb concluded that Lesser could return to work in his own occupation from a "physical standpoint."  [AR 1206.]  Dr. Whitcomb did not reconcile this conclusion with his findings from the IME and review of Lesser's medical records.  [*See id.*]  Instead, Dr. Whitcomb stated:

> My own recommendations, if I were involved in his case, were to
> obtain a further psychiatric or neuropsychiatric evaluation ….
> As far as I can tell from his history in the records, other kinds of
> treatment in addition to antidepressants and antianxiety medications
> have been recommended, some of which he has not been able to
> tolerate, such as mild stimulants like Provigil and Nuvigil, but
> other treatments, as stimulants, he has evidently not been willing to
> try such as Strattera, Adderall, and Ritalin….

[AR 1201.]  Dr. Whitcomb apparently overlooked that Lesser had been prescribed stimulants like Provigil and Nuvigil by Dr. DiFulco to stay awake during the day, *i.e.,* to treat his hypersomnolence, <u>not</u> any mental or nervous condition.  [*Id.* 60, 434.]  This is not surprising either, as nothing in the administrative record reflects that Dr. Whitcomb has expertise in psychiatry.

G.    <u>Reliance Standard's Vocational Review by the Same Analysis</u>

Following the IME, Reliance Standard referred Lesser's file for a vocational assessment by the <u>same analyst</u> who performed a vocational assessment during the initial claim review.  [AR 1209-10.]  Without any explanation or exposition, the

analyst summarily concluded that "in consideration of how this occupation is typically performed,… Lesser would be able to perform his regular occupation within the restrictions and limitations noted." [*Id.* 1210.] In doing so, the analyst ignored that the DOT job description called for an IQ at least in the 89th percentile and that Lesser tested in the 55th percentile. [*Id.* 287, 941.][5] She further ignored that Lesser's perceptual reasoning (34th percentile) was far below Reliance Standard's determination of the minimum standard (67th percentile) to perform his Regular Occupation. [AR 287,941.]

    H.    <u>Reliance Standard's Adverse Decision on Lesser's Appeal</u>

By letter dated November 20, 2017, Reliance Standard upheld its decision to terminate benefits to Lesser. [AR 132-37.] In this denial letter, though, Reliance Standard paid lip service to the fact that it had found Lesser to be totally disabled for at least part of the time. Again, however, Reliance Standard did not explain what changed between October 13 and 14 for benefits to terminate.

## III.    ARGUMENT AND CITATIONS OF AUTHORITY

In analyzing ERISA benefits claims, district courts in the Eleventh Circuit apply a six-step framework, as follows:

    (1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the

---

[5] When corrected for his demographic, Lesser's percentile was 18.4. [AR 941]

court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir. 2011) (*per curiam*). The Court is limited to the administrative record in making the above determinations. *Id.*; *Jett v. Blue Cross & Blue Shield, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

A. Reliance Standard's Decision to Terminate Benefits Was *De Novo* Wrong.

For purposes of the first step of the *Blankenship* analysis, a decision made by an ERISA administrator is "wrong" if, after a *de novo* review of the

administrative record, the Court does not agree with it. *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir. 2008).  Here, Reliance Standard's decision to terminate benefits was *de novo wrong*.

### 1. Lesser Met His Burden of Demonstrating He was Totally Disabled.

For LTD benefits to be payable, the Group Policy required Lesser to show that he could not perform "the material duties" of his Regular Occupation.  [AR 12.]  Under the federal common law of ERISA, "the material duties" means each and every duty such that their inability to perform even one material duty of their regular occupation entitles participants to total disability benefits under the Plan. *Accord Granger v. Life Ins. Co. of N. Am.,* 2016 U.S. Dist. LEXIS 182279, *29-30 (M.D. Fla. Mar. 28, 2016); *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1133-34 (9th Cir. 1996).

In paying him LTD benefits from August 13 through October 13, 2016, Reliance Standard necessarily determined that Lesser, due to sickness, was unable to perform one or more of the material duties of a software engineer on a full-time basis as of February 15, 2016.  [AR 11-12, 102-03.]  Indeed, the administrative record supports that Lesser's objectively documented cognitive impairments prevented him from engaging in complex and multi-level problem solving, and from designing highly technical computer software programs. [*Id.* 11-12, 102-03,

166, 187-90, 217, 939-42, 1205.]  These were among the material duties of Lesser's "Regular Occupation." [*Id.* 284-88.]

The case cited by Reliance Standard, *Hufford v. Harris Corp.,* 322 F. Supp. 2d 1345 (M.D. Fla. 2004), holds that once a claimant meets "his obligation under the plan of demonstrating total disability, the plan administrator [may] not terminate the payment of disability benefits in the absence of evidence that the claimant was no longer disabled."  *Id.* 1360 (citing *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1331 (11th Cir. 2001) ("Because Levinson satisfied his obligations under the terms of the plan, Reliance had to produce evidence showing that Levinson was no longer disabled in order to terminate his benefits.")).[6]  Under *Hufford* and *Levinson,* because Reliance Standard had found Lesser "Totally Disabled" under the Plan through October 13, 2016, benefits should not have been terminated absent a significant change in Lesser's hypersomnolence.  The administrative record belies that any such change occurred.

Indeed, Dr. Whitcomb, hired by Reliance Standard, opined that, <u>as of October 13, 2016,</u> Lesser's **"impairments were well-established"** and that he **"had shown no real improvement since … February of 2016."** [*Id.* 1205

---

[6] In contending otherwise, Reliance Standard misplaces reliance on *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241 (11th Cir. 2008), which did not involve a termination of benefits and, therefore, did not implicate the holding in *Levinson*.

(emphasis supplied).] Dr. Whitcomb further concluded that, in an 8-hour day, Lesser could not sit, stand, walk, bend at the waist, squat, climb stairs, use foot controls, or drive continuously, nor use either hand to perform simple grasping, reaching, pushing, pulling, fine manipulation, or keyboarding on a continuous basis. [*Id.* 1199-1200.] The fact that continuously performing one or more of these tasks over an 8-hour day is a material duty of Lesser's "Regular Occupation" perhaps explain why Dr. Whitcomb opined that "being a software engineer" may "be <u>impossible</u> to" Lesser. [*Id.* 1205 (emphasis supplied); *see also id.* at 284-88.]

In disregarding this aspect of Dr. Whitcomb's opinion, Reliance Standard improperly ignored that Lesser's "Regular Occupation," while perhaps sedentary from a purely physical standpoint, required significant cognitive tasks. [AR 286-88.] Doing so was *de novo* wrong. *See Pharr v. Continental Cas. Co.*, Case No. 6:03-cv-00735-ACC (M.D. Fla. May 12, 2004) ("[I]t is ludicrous to suggest that Pharr had the ability to carry out her occupational responsibilities while experiencing the symptoms and attendant functional limitations caused by her CFS.");[7] *Dorsey v. Provident Life & Acc. Ins. Co.*, 167 F. Supp. 2d 846, 855-56 (E.D. Pa. 2001) (granting summary judgment to ERISA plaintiff under plan's "own occupation" definition of total disability where insurer's vocational consultant never addressed the fact that plaintiff's job required traveling); *Small v.*

---

[7] A copy of *Pharr* is attached to this memorandum as Exhibit 1.

*First Reliance Standard Life Ins. Co*., 2005 U.S. Dist. LEXIS 3153, *18-19 (E.D.

Pa. Feb. 28, 2005) ("First Reliance failed to assess how Small's ability to function

at a sedentary level would enable her to perform the cognitive-based material

duties of her job.").

This notwithstanding, Reliance Standard ignored that the results of Lesser's

April 2017 FCE showed that his physical capabilities were "<u>below</u> sedentary."

*See, generally, Lake v. Hartford Life & Acc. Ins. Co*., 320 F. Supp. 2d 1240, 1249

(M.D. Fla. 2004) (FCEs are the "best means of assessing an individual's functional

level" and objectively quantifying his/her work-related restrictions and limitations

in ERISA cases).  *Accord Fick v. Metro. Life Ins. Co.,* 347 F. Supp. 2d 1271, 1280

(S.D. Fla. 2004); *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F. 3d 538, 548

(6th Cir. 2015).  Likewise, Reliance Standard arbitrarily failed to credit the

opinions of Dr. Rye and Dr. Mastrogianakis that "the findings and conclusions of

the FCE [were] consistent with [their respective] evaluation treatment,

observations and objective findings of Mr. Lesser's condition[.]" [AR 759-60.]

While an ERISA fiduciary is not required to give special weight to the opinions of

a claimant's treating physicians, it may not arbitrarily refuse to credit (let alone

ignore) reliable evidence, including the opinions of treating physicians. *Black &

Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *accord Claridge v.

Cont'l Cas. Co.,* 2006 U.S. Dist. LEXIS 77382, *33-34 (N.D. Fla. Oct. 24, 2006)

(administrator's benefits decision was *de novo* wrong where, as here, treating physician's opinion was disregarded without explanation) (citation omitted). That Reliance Standard arbitrarily disregarded reliable evidence of Plaintiff's disability renders the cases cited in the motion for summary judgment factually inapposite. *Compare, e.g.,* AR 940 (wherein neuropsychologist Dr. Loring noted that Lesser did not suffer from any hallucinations or delusions, and that, despite his health concerns, there was <u>no</u> evidence of somatization) *with Oates v. Walgreen Co.*, 573 Fed. Appx. 897 (11th Cir. 2014) (where, unlike here, the evidence "tending to establish that [claimant] was able to perform sedentary work was not obviously unreliable"); *Glenn v. Am. United Life Ins. Co.*, 604 Fed. Appx. 893 (11th Cir. 2015) (where, also unlike here, claimant did not offer proof of cognitive impairment); *Smith v. Pension Comm. Of Johnson & Johnson*, 470 Fed. Appx. 864 (11th Cir. May 29, 2012) (where results of a neurological evaluation were invalidated due to suspected malingering); *Paramore v. Delta Air Lines,* 129 F.3d 1446 (11th Cir. 1997) (where "[m]ost of [the claimant's] stress and psychological pressures [were] being diverted into somatic symptoms"); *Jorgensen v. Metro. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 201647, *12, *16 (N.D. Ga. 2013) (where, unlike here, no specific testing of claimant's cognitive function was performed and results of FCE were inconsistent with objective findings).

Reliance Standard claims that Lesser's neuropsychological testing was "overwhelmingly normal and any abnormality was mild. AR938-945." However, Dr. Loring found that Lesser's General Ability, while normal for the general population, was in the 61st percentile, well below the 89th percentile that Reliance Standard determined was the minimum requirement for a software engineer in the national economy. [AR 287, 941]. Dr. Loring also mentioned numerous other assessments that showed "impairment." [AR 942-43.]

In short, Lesser's documented inability to perform even one material duty of the regular occupation of a software engineer <u>at all relevant times</u> precluded Reliance Standard's finding that he was not Totally Disabled under the Plan. The decision to terminate benefits, therefore, was *de novo* wrong.

2. <u>Reliance Standard Incorrectly Conflates Plaintiff's Hypersomnia with Sleep Apnea and Narcolepsy.</u>

The fact that Reliance Standard incorrectly conflates Plaintiff's disability claim as due to sleep apnea (MSJ, p. 13) and/or narcolepsy (MSJ, p. 15 & n. 20) bolsters that its claim decision was *de novo* wrong. Plaintiff claimed to have become "Totally Disabled" due to Hypersomnolence, not sleep apnea. [AR 142,

166.][8]   And narcolepsy was ruled out as a diagnosis by Plaintiff's treating

physicians. [*Id.* at 882.]

B. <u>Reliance Standard's Decision to Terminate Benefits Was Unreasonable.</u>

Because Reliance Standard had the requisite discretion under the Plan,

*Blankenship* requires this Court to determine whether the decision to terminate

benefits to Lesser was reasonable.  The administrative record shows it was not.

In its termination letter dated February 21, 2017, Reliance Standard

mischaracterized Lesser's hypersomnia as purely "self-reported".   [AR 126.]

Notwithstanding that a "self-reported" condition (by itself) would not have entitled

Reliance Standard under the Group Policy to terminate benefits prior to 24 months

of payment [*id.* at 24, 26], the administrative record belies that Lesser's total

disability could not "be verified using generally accepted standard medical

procedures and practices." [*Id.* 26.]  Indeed, a sleep study, bloodwork, wrist

actigraphy, a PVT, CPAP data, and neuropsychological testing: (1) document that

Lesser suffers from primary hypersomnia; (2) provide objective bases for Lesser's

extreme fatigue and chronic sleepiness; and (3) belie that Lesser's disabling

---

[8] Hence, *Hill v. Hartford Life & Acc. Ins. Co.*, 2009 U.S. Dist. LEXIS 140126
(N.D. Ga. Sept. 16, 2009) and *Stiltz v. Metro. Life Ins. Co.,* 2006 U.S. Dist. LEXIS
65394 (N.D. Ga. Aug. 30, 2006), cited by Reliance Standard, are factually
apposite.  So, too, is *Turner v. Am. Airlines, Inc.*, 2011 U.S. Dist. LEXIS 43242
(S.D. Fla. 2011), which involved a claimant who (unlike Lesser) failed to comply
with his CPAP regimen despite his diagnosed sleep apnea.  Again, Lesser did not
claim Total Disability due to sleep apnea.

symptoms were "self-reported." [*Id.* 1202, 1204.] *See also, generally, Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 322 (7th Cir. 2007) (distinguishing "between the amount of fatigue or pain an individual experiences, which … is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured").

None of this matters, however, as terminating benefits simply because a disabling condition lacks a clear etiology is an abuse of discretion where, as here: (1) the Plan does not require a definitive etiology; and (2) the condition is verifiable by objective medical tests. *Accord Brucks v. Coca-Cola Co.,* 391 F. Supp. 2d 1193, 1206 (N.D. Ga. 2005) (even if a diagnosis does not lend itself to objective clinical findings, the physical limitations imposed by the symptoms of such condition may lend themselves to objective analysis); *Florence Nightingale Nursing Serv. v. Blue Cross/Blue Shield*, 41 F.3d 1476, 1484 (11th Cir.1995) (ERISA fiduciary abuses its discretion when, like Reliance Standard did here, it uses standards not required in the Plan when making claim determinations). *See also Godfrey v. BellSouth Telecomm., Inc*., 89 F.3d 755, 759-60 (11th Cir. 1996) (idiopathic diagnoses like fibromyalgia "can be severely disabling and can only be diagnosed by an examination of the patient"); *Pharr v. Continental Cas. Co*., *supra* (granting summary judgment to ERISA plaintiff who claimed total disability due to idiopathic conditions of fibromyalgia and chronic fatigue); *Russell v. UNUM Life*

*Ins. Co. of Am.*, 40 F. Supp. 2d 747, 750-51 (D.S.C. 1999) (fibromyalgia did not

fall under ERISA plan's "self-reported symptom" limitation where, like Lesser's

hypersomnia, it could be and, in fact, was verified by objective medical evidence);

*Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 422-43 (3d. Cir. 1997) (ERISA

fiduciary impermissibly implied additional "clinical evidence of etiology"

requirement not specified in disability plan). *But cf. Bloom v. Hartford Life & Acc.*

*Ins. Co.,* 558 Fed. Appx. 854 (11th Cir. 2014) (where, unlike here, claimant's

disability was supported only by her self-reports and not by objective tests).

That Lesser had worked for some time despite his hypersomnia before

seeking LTD benefits does not change this analysis for two reasons. First,

Reliance Standard inexplicably refused to address the gradual and continuing

nature of his disability, as Dr. DiFulco explained. [*See, e.g.,* AR 174.] Second,

under ERISA, a participant's struggle to continue working while his health is

deteriorating (as Lesser did here) does not count against his disability claim; rather,

it is a credit. *See Marecek v. Bellsouth Telecommunications, Inc*., 49 F.3d 702, 706

(11th Cir. 1995) (disabled participant's attempt to return to work for courses did

not show she, in fact, was no longer totally disabled); *Godfrey*, 89 F.3d at 759

("[W]ith a dependent son, the plaintiff had no real choice other than to dope herself

up with the medications that had been prescribed for her and get in the car,

contrary to medical advice, drive herself to work, and then work while under the

influence of a combination of very potent drugs."); *Levinson*, 245 F.3d at 1326 n.6 ("We doubt that Levinson's status as a full-time employee constitutes evidence that he was able to perform the material duties of his occupation on a full-time basis."); *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 392 (3d Cir. 2003) ("A claimant's return to work is not dispositive of his or her disability when economic necessity compels him or her to return to work.").

In its brief, Reliance Standard misrepresented clinical notes from Dr. Mastrogianakis dated October 3, 2016, in which she scribbled "'doing ok'… 'sleep ok', and 'insomnia ok, sleeping too much' [AR 500]."  Reliance Standard argues that these notes indicate that Lesser had improved so that its termination of benefits was justified. In so arguing, Reliance Standard ignores: (1) Dr. Rye's clinical notes from just four days later showing that Lesser "does seem to have primary hypersomnia based upon actigraphy revealing very close to 11 hours of sleep per day...." [AR 373]; (2) Lesser's subsequent visit with Dr. Mastrogianakis on November 2, 2016, in which she confirmed Dr. Rye's findings that actigraphy supported the hypersomnia diagnosis [*id.* 313]; and (3) the fact that Dr. Mastrogianakis found that "the findings and conclusions of the [April 2017] FCE [were] consistent with [her] evaluation, treatment, observations and objective findings of Mr. Lesser's condition." [*Id.* at 760].

Reliance Standard, in citing to Dr. Rye's clinical notes dated January 29, 2017 [AR 1033], compounds its procedural and substantive gaffes by misrepresenting Lesser's disability as OSA. But, again, Lesser did not claim disability benefits for OSA. Reliance Standard ignored that Dr. Rye found that, despite his demonstrated adherence with the CPAP machine, Lesser still suffered from hypersomnia[.]" [*Id.* at 363.]

In disregarding objective medical evidence produced by Lesser's treating physicians, and in relying selectively on parts of Dr. Whitcomb's opinion while ignoring other parts which did not support its position, Reliance Standard, in terminating Lesser's benefits, acted arbitrarily and capriciously.

C.  The Administrative Record Shows Reliance Standard Suffered an Actual Conflict of Interest in Terminating Benefits.

In the event that this Court finds that reasonable grounds for Reliance Standard's claim termination exist, which is denied, it must determine if Reliance Standard has a conflict of interest. Reliance Standard suffered from a structural conflict insofar as it both decided claims for benefits and paid them. *Accord, generally, Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Thus, the Court would have to determine if such conflict tainted its benefits decision. Multiple procedural and substantive defects in the administrative record show that it did.

For example, Reliance Standard relied only on a nurse's review prior to

initially terminating Lesser's benefits. Terminating benefits based upon a nurse's

review of records, without an IME, showed conflict. *See Helms v. Gen. Dynamics*

*Corp.*, 222 F. App'x 821, 829 (11th Cir. 2007) ("Aetna's reliance on a registered

nurse's review of an admittedly subjective diagnosis without so much as a peer

review or an IME was wrong and unreasonable.") (citing *Godfrey*, 89 F.3d at 758-

759 (where record supported that defendant's physicians arbitrarily rejected clear

medical evidence that plaintiff without examining her themselves or seeking

treatment notes of her doctors); *Brown v. Blue Cross & Blue Shield of Alabama,*

*Inc.,* 898 F.2d 1556, 1566 n.11 (11th Cir. 1990) (taint may be inferred from

administrator's failure to investigate).

Reliance Standard also improperly "cherry-picked" parts of Dr. Whitcomb's

opinion out of context and, in doing so, ignored his inherently contradictory

opinion that Lesser's condition had not changed, and that he could not

continuously perform tasks essential to his occupation. "This inconsistent

treatment of the same authority in two separate instances … raises the likelihood of

self-dealing." *Pinto v. Reliance Standard Life Ins. Co*., 214 F.3d 377, 394 (3d Cir.

2000). Deference should be "ratcheted" downward by such "suspicious events."

*Id. Accord Hagberg v. Liberty Life Assurance Co*., 321 F. Supp. 2d 1270, 1273

(N.D. Fla. 2004) (administrator showed actual conflict of interest where IME

physician, as Dr. Whitcomb did here, agreed with claimant's diagnosis given by treating physicians and provided no reasoned explanation why, contrary to the other medical opinions, he believed claimant could work a sedentary job 40 hours a week); *Ferguson v. Hartford Life & Accident Ins. Co*., 268 F. Supp. 2d 463, 471 (E.D. Pa. 2003) (claim administrator's selectivity in evidence and disregard of sleep studies and other records supporting participant's claim of disabling sleep disorder "invites a closer scrutiny of the decision making process").

Especially troubling is Dr. Whitcomb's gratuitous suggestion that Lesser's symptoms were the result of a Mental or Nervous Disorder. Notwithstanding the physical etiology of his condition, *supra,* and that Reliance Standard already had determined that the Group Policy's Mental/Nervous limitation did not apply to Lesser's claim [AR 89], Dr. Whitcomb did not specialize in any form of psychiatry. That Dr. Whitcomb confused stimulants that Lesser had been prescribed for his hypersomnia as treatment of a mental or nervous condition bolsters this conclusion. [*Id.* 60, 434, 1201.]

Even more glaring, Dr. Whitcomb's comment ignores that Dr. Loring found no evidence of somatization. [*Id.* at 940.] Simply put, nothing in the administrative record suggests that a mental disorder caused Lesser's hypersomnia. *See, e.g., Nevitt v. Standard Ins. Co.,* 2009 U.S. Dist. LEXIS 114142, at *15 (N.D. Ga. Dec. 3, 2009) (rejecting administrator's determination that mental disorder

contributed to participant's migraines, where his treating physicians each noted that his migraines were likely related to his cervical injuries and were "not surprising" given his condition). Nor did Reliance Standard terminate benefits based on any such limitation in the Plan. *Post-hoc* justifications for the denial of benefits are further evidence of Reliance Standard's taint. *See Marecek v. Bellsouth Telecomms., Inc.*, 49 F.3d 702, 706 (11th Cir. 1995) (ERISA "*post hoc* explanations are without merit.").

## IV. CONCLUSION

In short, Reliance Standard's termination of benefits was *de novo* wrong, unreasonable, and tainted by self-interest. Consequently, Lesser is entitled to judgment reinstating his claim retroactive to October 14, 2016, as well as an award of prejudgment interest, and attorney fees under 29 U.S.C. § 1132(g).

Respectfully submitted, this 6th day of December, 2018.

/s/*Paul J. Sharman*
Paul J. Sharman
Georgia Bar No. 227207
The Sharman Law Firm LLC
11175 Cicero Dr., Suite 100
Alpharetta, Georgia 30022
(678) 242-5297
paul@sharman-law.com

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ARTHUR F. LESSER, IV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO.: 1:18-CV-00824-TWT |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY. | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that I have this day typed the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with one of the font and point selections approved in LR 5.1C and electronically filed it with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

This __ day of December, 2018.

s/*Paul J. Sharman*
Paul J. Sharman
Georgia Bar No. 227207